**[NOT YET SCHEDULED FOR ORAL ARGUMENT]**

No. 15-5199

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

⸻

UNITED STATES ASSOCIATION OF REPTILE KEEPERS, INC.; BENJAMIN
RENICK; MATTHEW EDMONDS; RAUL EDUARDO DIAZ, JR.; and
CAROLINE SEITZ,

*Plaintiffs-Appellees*,

v.

S.M.R. JEWELL, in her official capacity as Secretary of the Interior; and the
UNITED STATES FISH AND WILDLIFE SERVICE,

*Defendants-Appellants*,

and

THE HUMANE SOCIETY OF THE UNITED STATES, and CENTER FOR
BIOLOGICAL DIVERSITY,

*Intervenor-Defendants-Appellees*,

⸻

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

⸻

**OPENING BRIEF OF THE FEDERAL APPELLANTS**

⸻

JOHN C. CRUDEN
*Assistant Attorney General*

*Of Counsel:*

RUSSELL HUSEN
  *Attorney-Advisor*
  *Office of the Solicitor*
  *U.S. Department of the Interior*
  *Washington, DC*

MEREDITH L. FLAX
EMILY A. POLACHEK
  *Attorneys, Appellate Section*
  *Environment and Natural Resources Div.*
  *U.S. Department of Justice*
  *P.O. Box 7415*
  *Washington, D.C.  20044*
  *(202) 514-5442*
  *emily.polachek@usdoj.gov*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A.     Parties and Amici.

Federal Defendants-Appellants are S.M.R. Jewell, Secretary of the Interior, and the U.S. Fish & Wildlife Service.

Plaintiffs-Appellees are the United States Association of Reptile Keepers, Benjamin Renick, Matthew Edmonds, Raul Eduardo Diaz, Jr., and Caroline Seitz.

Intervenor-Defendants-Appellees are The Humane Society of the United States and Center for Biological Diversity.

The Center for Invasive Species Prevention, the Natural Areas Association, and the Wildlife Society participated as amici in the district court, and Federal Appellants have been informed that these same organizations, and perhaps others, plan to participate as amici before this Court.

## B.     Rulings Under Review.

The rulings under review are the Memorandum Opinions entered on May 12, 2015, and May 19, 2015, and the Order and preliminary injunction issued on May 19, 2015 by the United States District Court for the District of Columbia (Hon. Randolph D. Moss), in case no. 13-2007.  The Memorandum Opinions are reported as *U.S. Association of Reptile Keepers, Inc. v. The Honorable Sally Jewell*, ___ F. Supp. 3d ___, 2015 WL 2207603 (D.D.C. May 12, 2015), and *U.S. Association of*

i

*Reptile Keepers, Inc. v. The Honorable Sally Jewell*, ___ F. Supp. 3d ___, 2015 WL 2396075 (D.D.C. May 19, 2015).

### C.    Related Cases.

To the best of counsel's knowledge, no related cases are pending in this Court or any other court.

s/ Emily A. Polachek
EMILY A. POLACHEK

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .................. i

TABLE OF CONTENTS .............................................................................. iii

TABLE OF AUTHORITIES ............................................................................ v

GLOSSARY ............................................................................................... xiv

STATEMENT OF JURISDICTION ................................................................. 1

STATEMENT OF THE ISSUES ..................................................................... 1

PERTINENT STATUTES AND REGULATIONS ............................................. 2

STATEMENT OF THE CASE ......................................................................... 2

    I.     STATUTORY BACKGROUND ............................................................. 2

    II.     FACTUAL BACKGROUND ................................................................. 5

    III.     PROCEDURAL BACKGROUND ......................................................... 9

SUMMARY OF ARGUMENT ....................................................................... 11

STANDARD OF REVIEW ........................................................................... 13

ARGUMENT ............................................................................................. 13

    I.     UNDER *CHEVRON* STEP ONE, PRINCIPLES OF STATUTORY
       CONSTRUCTION SHOW THAT CONGRESS INTENDED TO PROHIBIT
       INTERSTATE TRANSPORTATION OF INJURIOUS WILDLIFE UNDER
       THE LACEY ACT. ........................................................................... 14

       A.     The plain language of § 42(a)(1) supports the Service's
          interpretation. ........................................................................ 14

       B.     The purpose of the Lacey Act supports the Service's
          interpretation of the Act's injurious wildlife provision. ................. 18

C.      Legislative history shows that Congress intended to prohibit interstate transport of injurious wildlife from the time the Lacey Act was first enacted...................................19

      1.      *Initial Enactment through 1948* ..................................20

      2.      *1960 Amendments* .....................................................22

      3.      *Legislative History from the Last Quarter-Century*.......................26

D.      Alternatively, recent Congresses ratified or impliedly amended 18 U.S.C. § 42(a)(1) to comport with the Service's longstanding interpretation.................................35

      1.      *Ratification* ...............................................................36

      2.      *Implied Amendment*....................................................42

      3.      *The district court's rationale in rejecting ratification and implied amendment was incorrect.* ...................................43

II.      UNDER *CHEVRON* STEP TWO, THE COURT SHOULD DEFER TO THE SERVICE'S REASONABLE INTERPRETATION OF THE INJURIOUS WILDLIFE PROVISION.......................................................45

A.      The Service's interpretation of 18 U.S.C. § 42 was reasonable and entitled to deference.................................45

B.      The rule of lenity does not preclude *Chevron* deference in this case..................................................................50

III.     THE DISTRICT COURT ABUSED ITS DISCRETION WHEN BALANCING USARK'S ALLEGED HARM AGAINST THE PUBLIC'S INTEREST IN PREVENTING CATASTROPHIC ECOLOGICAL HARM FROM GIANT CONSTRICTORS. ........................................53

CONCLUSION ......................................................................55

# TABLE OF AUTHORITIES

## CASES:

*AKM L.L.C. dba Volks Constructors v. Sec'y of Labor,*
675 F.3d 752 (D.C. Cir. 2012) ........................................................49

*Ala. Educ. Ass'n v. Chao,*
455 F.3d 386 (D.C. Cir. 2006) ................................................ 46, 49

*Alexander v. Sandoval,*
532 U.S. 275 (2001) ......................................................................37

*Am. Meat Inst. v. U.S. Dep't of Agric.,*
968 F. Supp. 2d 38 (D.D.C. 2013) ................................................53

*Amoco Prod. Co. v. Vill. of Gambell,*
480 U.S. 531 (1987) ......................................................................54

*Babbitt v. Sweet Home Chapter, Communities for Great Ore.,*
515 U.S. 687 (1995) ........................................... 48, 50, 51, 52

* *Barnhart v. Walton,*
535 U.S. 212 (2002) ........................................... 36, 37, 47, 49

*Bilski v. Kappos,*
561 U.S. 593 (2010) ......................................................................34

*Brown v. General Servs. Admin.,*
425 U.S. 820 (1961) ......................................................................43

*Chaplaincy of Full Gospel Churches v. England,*
454 F.3d 290 (D.C. Cir. 2006) ................................................ 52, 53

* *Chevron U.S.A., Inc. v. Nat. Res. Def. Council,*
467 U.S. 837 (1984) ....................1, 10, 11, 12, 13, 14, 45, 46, 47, 49, 50, 51, 52

*City of Arlington, Tex. v. FCC,*
133 S. Ct. 1863 (2013) ..................................................................47

---

* Authorities chiefly relied upon are marked with an asterisk.

*Commodity Futures Trading Com'n v. Schor,*
    478 U.S. 833 (1986) ........................................................................37

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,*
    447 U.S. 102 (1980) ........................................................................35

*Crandon v. United States,*
    494 U.S. 152 (1990) ........................................................................18

*Davis v. Pension Benefit Guar. Corp.,*
    571 F.3d 1288 (D.C. Cir. 2009) ....................................................13

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ........................................................................36

*Fla. Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985) ........................................................................14

*Ginsburg, Feldman & Bress v. Fed. Energy Admin.,*
    591 F.2d 717 (D.C. Cir. 1978) ......................................................29

*Griffin v. Oceanic Contractors, Inc.,*
    458 U.S. 564 (1982) ........................................................................16

*Grove City College v. Bell,*
    465 U.S. 555, 564–67 (1984) ........................................................37

*Howard v. Pritzker,*
    775 F.3d 430 (D.C. Cir. 2015) .................................................. 42, 43

*In re Sealed Case,*
    223 F.3d 775 (D.C. Cir. 2000) ...................................................... 51

*Kasten v. Saint-Gobain Performance Plastics Corp.,*
    131 S. Ct. 1325 (2011) .............................................................. 51, 52

*King v. Burwell,*
    135 S. Ct. 2480 (2015) .............................................................. 18, 19

_____

\* Authorities chiefly relied upon are marked with an asterisk.

*Mackey v. Lanier Collection Agency & Serv., Inc.,*
    486 U.S. 825 (1988) ................................................................... 35

*March v. United States,*
    506 F.2d 1306 (D.C. Cir. 1974) .................................................. 24

*Mayo Found. for Med. Educ. & Research v. United States,*
    562 U.S. 44 (2011) ...................................................................... 46

*Menkes v. U.S. Dep't of Homeland Sec.,*
    637 F.3d 319 (D.C. Cir. 2011) ................................................... 49

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,*
    456 U.S. 353 (1982) .................................................................... 36

*N. Broward Hosp. Dist. v. Shalala,*
    172 F.3d 90 (D.C. Cir. 1999) ..................................................... 34

*NLRB v. Bell Aerospace Co.,*
    416 U.S. 267 (1974) .................................................................... 37

*Natural Res. Def. Council v. Browner,*
    57 F.3d 1122 (D.C. Cir. 1995) ................................................... 14

*New York State Dep't of Soc. Servs. v. Dublino,*
    413 U.S. 405 (1973) .................................................................... 19

*North Haven Bd. of Educ. v. Bell,*
    456 U.S. 512 (1982) .................................................................... 38

*Palestine Info. Office v. Shultz,*
    853 F.2d 932 (D.C. Cir. 1988) ................................................... 15

*Parker v. Califano,*
    561 F.2d 320 (D.C. Cir. 1977) .............................................. 34, 48

*Pub. Citizen, Inc. v. U.S. Dep't of Health and Human Serv.,*
    332 F.3d 654 (D.C. Cir. 2003) ................................................... 36

_____

\* Authorities chiefly relied upon are marked with an asterisk.

vii

*Radzanower v. Touche Ross & Co.,*
    426 U.S. 148 (1976).............................................................42

*Reiter v. Sonotone Corp.,*
    442 U.S. 330 (1979).............................................................15

*Rodriguez v. United States,*
    480 U.S. 522 (1987).............................................................43

*SEC v. Sloan,*
    436 U.S. 103 (1978).............................................................41

*Serono Labs. v. Shalala,*
    158 F.3d 1313 (D.C. Cir. 1998).............................................13

*Skidmore v. Swift & Co.,*
    323 U.S. 134 (1944).............................................................51

*Staples v. United States,*
    511 U.S. 600 (1994).............................................................18

*Tennessee Valley Authority v. Hill,*
    437 U.S. 153 (1978).............................................................42

*United States v. Abramski,*
    134 S. Ct. 2259 (2014).........................................................52

*United States v. Apel,*
    134 S. Ct. 1144 (2014).........................................................52

*United States v. Bergh,*
    352 U.S. 40 (1956)...............................................................37

*United States v. Estate of Romani,*
    523 U.S. 517 (1998).............................................................43

*United States v. Gen. Motors Corp.,*
    518 F.2d 420 (D.C. Cir. 1975)...............................................34

_____

\* Authorities chiefly relied upon are marked with an asterisk.

*United States v. Kanchanalak,*
    192 F.3d 1037 (D.C. Cir. 1999) ........................................................51

*United States v. Mead Corp.,*
    533 U.S. 218 (2001) .................................................................. 46, 47

*United States v. O'Hagan,*
    521 U.S. 642 (1997) ........................................................................52

*Vill. of Barrington v. Surface Transp. Bd.,*
    636 F.3d 650 (D.C. Cir. 2011) ........................................................45

*Whitman v. United States,*
    135 S. Ct. 352 (2014) .....................................................................52

*Wis. Gas Co. v. Fed. Energy Regulatory Com.,*
    758 F.2d 669 (D.C. Cir. 1985) ................................................... 53, 54

*Yates v. United States,*
    135 S. Ct. 1074 (2015) .............................................................. 17, 50

## STATUTES:

5 U.S.C. §§ 601–612 ...........................................................................9

5 U.S.C. § 611 .....................................................................................1

5 U.S.C. § 702 .....................................................................................1

28 U.S.C. § 1292(a)(1) .........................................................................1

28 U.S.C. § 2201 .................................................................................1

Asian Carp Prevention and Control Act,
    Pub. L. No. 111-307, § 2, 124 Stat. 3282 (2010) .......................... 32, 37

Food, Agriculture, Conservation, and Trade Act Amendments of 1991,
    Pub. L. No. 102-237, § 1013, 105 Stat. 1818, 1901 (1991) ............ 30, 37

---

* Authorities chiefly relied upon are marked with an asterisk.

* The Lacey Act of 1900,
 16 U.S.C. § 701 .................................................................... 2, 3, 18, 19, 46
 16 U.S.C. § 3372 .................................................................................. 17, 20
 18 U.S.C. § 42(a)(1) ..................... 1–4, 8, 10–16, 18, 23, 26, 27, 29–46, 49–51, 54
 18 U.S.C. § 42(a)(5) ........................................................................ 3, 46, 47
 Ch. 553, § 1, 31 Stat. 187 (1900) ........................................................... 2, 21
 Ch. 553, § 2, 31 Stat. 188 (1900) ......................................................... 20, 21
 Ch. 553, § 3, 31 Stat. 188 (1900) ....................................................17, 20, 21
 Ch. 9, § 241, 35 Stat. 1137 (1909) ............................................................. 21
 Ch. 9, § 242, 35 Stat. 1137 (1909) ............................................................. 21
 Ch. 645, § 42, 62 Stat. 687 (1948) ............................................................. 21
 Ch. 645, § 43, 62 Stat. 684 (1948) ............................................................. 22
 Pub. L. No. 86-702, § 42, 74 Stat. 753 (1960) ........................................ 22, 23
 Pub. L. No. 86-702, § 43, 74 Stat. 753 (1960) ........................................ 22, 23

Lake Pontchartrain Basin Restoration Program Authorization and Federal
 Building Designations, Pub. L. No. 112-237, § 5, 126 Stat. 1628 (2012) ...........33

Nonindigenous Aquatic Nuisance Prevention and Control Act of 1990,
 16 U.S.C. § 4701 ....................................................................................... 28
 Pub. L. No. 101-646, § 1208, 104 Stat. 4671 (1990) ................................. 28, 36

## **REGULATIONS:**

50 C.F.R. § 16.3 ...................................................................................... 3, 4

50 C.F.R. § 16.11 ................................................................................... 4, 27

50 C.F.R. § 16.13 .............................................................................. 4, 31, 32

50 C.F.R. § 16.15 ............................................................................... 4, 7, 30

47 Fed. Reg. 56,360 (Dec. 16, 1982) ........................................................... 27

54 Fed. Reg. 22,286 (May 23, 1989) ...................................................... 28, 40

55 Fed. Reg. 17,439 (Apr. 25, 1990) ...................................................30, 40, 48

56 Fed. Reg. 56,942 (Nov. 7, 1991) ............................................................. 40

---

* Authorities chiefly relied upon are marked with an asterisk.

67 Fed. Reg. 39,865 (June 11, 2002) ...................................................................40

67 Fed. Reg. 62,193 (Oct. 4, 2002) ............................................................... 40, 48

72 Fed. Reg. 37,459 (July 10, 2007) ................................................. 31, 39, 40, 48

72 Fed. Reg. 59,019 (Oct. 18, 2007) ....................................................... 31, 39, 40

73 Fed. Reg. 57,84 (Jan. 21, 2008) ................................................................. 5, 51

75 Fed. Reg. 11,808 (Mar. 12, 2010) ........................................................... 7, 40

76 Fed. Reg. 15,857 (Mar. 22, 2011) ..............................................................40

77 Fed. Reg. 3,330 (Jan. 23, 2012) ............................................................... 7, 40

79 Fed. Reg. 35,719 (June 24, 2014) ..................................................................7

80 Fed. Reg. 12,702 (Mar. 10, 2015) ........................................6, 8, 40, 51, 54, 55

## LEGISLATIVE HISTORY:

### *Reports*

H. Rep. No. 80-304 (1947) ........................................................................ 21, 22

H. Rep. No. 86-1823 (1960) ...............................................................22, 23, 26

H. Rep. No. 109-585 (2006) ...........................................................................32

H. Rep. No. 112-657 (2012) ...................................................................... 33, 34

H. Rep. No. 112-691 (2012) ........................................................................ 8, 44

S. Rep. No. 86-1883 (1960)............................................................................17

S. Rep. No. 101-523 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6455......................28, 29, 30

S. Rep. No. 111-181 (2010).............................................................................32

---

\* Authorities chiefly relied upon are marked with an asterisk.

### Hearings

136 Cong. Rec. S17147 (daily ed. Oct. 26, 1990) (statement of Sen. Glenn) ................29

*Asian Carp and the Great Lakes: Hearing Before the Subcomm. on the Water Res. and Env't of the H. Comm. on Transp. & Infrastructure*, 111th Cong. (2010) (statement of Rebecca Humphries, Dir. of Mich. Dep't of Natural Res. & Env't) ...........................................................................................32

*Asian Carp: Hearing Before the Subcomm. on Water & Power of the Senate Comm. on Energy & Natural Res.*, 111th Cong. (2010) (statement of Leon Carl, U.S. Geological Survey, Dep't of the Interior) ................................................32

*H.R. 10329 and H.R. 10598: Hearing Before the House Comm. on the Judiciary*, 86th Cong. (1960) ........................................................23, 24, 25, 26, 49

*The Nonindigenous Aquatic Nuisance Act of 1990: Hearing Before the Subcomm. on Envtl. Protection of the Senate Comm. on Env't & Pub. Works*, 101st Cong. (1990) .................................................................................................28, 29

*Proposed Injurious Wildlife Regulations: Hearing Before the Subcomm. on Fisheries & Wildlife Conservation and the Env't of the H. Comm. on Merchant Marine & Fisheries*, 93d Cong. (1974) ...........................................................24

### Proposed Bills

H.R. 511, 112th Cong. (2011) ...............................................................................8

H.R. 511, 112th Cong. (2012) .........................................................................8, 44

### OTHER:

1A Norman B. Singer & J.D. Shambie Singer, Sutherland Statutory Construction (7th ed. 2009) ...........................................15, 16

*Legislative Hearing on H.R. 511 Before the Subcomm. on Fisheries, Wildlife, Oceans and Insular Affairs of the H. Comm. on Nat. Res.*, 112th Cong. (2012), http://www.gpo.gov/fdsys/pkg/CHRG-112hhrg77021/pdf/CHRG-112hhrg77021.pdf (statement of Andrew Wyatt, President, USARK) ........50, 51

---

\* Authorities chiefly relied upon are marked with an asterisk.

Robert N. Reed & Gordon H. Rodda, *Giant Constrictors: Biological and Management Profiles and an Establishment Risk Assessment for Nine Large Species of Pythons, Anacondas, and the Boa Constrictor* (2009), http://pubs.usgs.gov/of/2009/1202/pdf/OF09-1202.pdf ......................... 5, 6, 7

Stern et al., Cong. Research Serv., R41082, *Asian Carp and the Great Lakes Region* (2014) ............................................................................................. 31

U.S. Dep't of the Interior, *Proposal by the Fish and Wildlife Service to Prohibit Importation of the Raccoon Dog,* Nyctereutes procyonoides*, Into the United States* (1982), http://www.fws.gov/injuriouswildlife/pdf_files/Raccoon_dog_EA_and_FONSI.pdf ......................................................................... 27, 40, 48

---

* Authorities chiefly relied upon are marked with an asterisk.

# GLOSSARY

APA        Administrative Procedure Act

NEPA       National Environmental Policy Act

USARK      Plaintiffs United States Association of Reptile Keepers,
           Benjamin Renick, Matthew Edmonds, Raul Eduardo Diaz, Jr.,
           and Caroline Seitz

## STATEMENT OF JURISDICTION

Plaintiffs United States Association of Reptile Keepers, Benjamin Renick, Matthew Edmonds, Raul Eduardo Diaz, Jr., and Caroline Seitz (collectively "USARK") invoked the district court's jurisdiction under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702; the Small Business Regulatory Enforcement and Fairness Act, 5 U.S.C. § 611; and the Declaratory Judgment Act, 28 U.S.C. § 2201. ECF No. 27-1. The district court issued a preliminary injunction on May 19, 2015. Federal Defendants filed a timely notice of appeal on July 17, 2015. [Dkt. 71]. This Court's jurisdiction rests on 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

This case concerns the statutory construction of the injurious species provision of the Lacey Act, 18 U.S.C. § 42(a)(1), which, in relevant part, criminalizes the transportation of "injurious" wildlife "between the continental United States, the District of Columbia, Hawaii, the Commonwealth of Puerto Rico, or any possession of the United States" without a permit. The following questions are presented for review:

1.  Should the district court have found, under *Chevron* step one, that USARK was not likely to succeed on its claim that 18 U.S.C. § 42(a)(1) does not allow the U.S. Fish & Wildlife Service to prohibit the unpermitted interstate transportation of injurious wildlife between states within the continental United States?

    a.  Does the plain language of § 42(a)(1) show congressional intent to prohibit transport of injurious species between states within the continental United States?

1

b.  Do other indicia of congressional intent, including the Lacey Act's purpose and legislative history dating back to its enactment in 1900, support the Service's interpretation?

c.  Did recent Congresses ratify the Service's interpretation or impliedly amend § 42(a)(1) when designating new injurious species?

2.  Should the district court have deferred to the Service's reasonable interpretation of the scope of its delegated authority?

3.  Did the district court abuse its discretion in finding that USARK's speculative economic harm outweighed the public's interest in preventing catastrophic environmental harm from the listed constrictors?

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in Volume I of the separately bound addendum.  Volume II of that addendum contains the relevant legislative history that is cited in this brief.

## STATEMENT OF THE CASE

### I.  STATUTORY BACKGROUND

Enacted in 1900, the Lacey Act is one of the oldest wildlife protection statutes in the United States.  A central purpose of the Lacey Act is to "regulate the introduction of American or foreign birds or animals in localities where they have not heretofore existed."  Ch. 553, § 1, 31 Stat. 188 (1900) (codified at 16 U.S.C. § 701).  Among other prohibitions on wildlife trade, the Act makes it a crime to import "injurious" wildlife into the United States and to ship such wildlife "between the continental United States, the District of Columbia, Hawaii, the Commonwealth of

2

Puerto Rico, or any possession of the United States" without a permit.  18 U.S.C.

§ 42(a)(1), (a)(3).  The scope of the quoted language, which was introduced in a 1960

amendment to the Lacey Act, is at issue here.

The injurious-wildlife provision of the Lacey Act delegates to the Secretary of

the Interior the authority to "enforce the provisions of this subsection, including any

regulations issued hereunder."  *Id.* § 42(a)(5); *see also* 16 U.S.C. § 701.  Acting under the

Secretary of the Interior's delegated authority, the U.S. Fish & Wildlife Service ("the

Service") lists wildlife as injurious; issues permits for the importation and interstate

transport of injurious wildlife for "zoological, educational, medical, and scientific

purposes"; and enforces the prohibition on importation and shipment.  18 U.S.C.

§ 42(a).  Pursuant to this authority, the Service promulgated an injurious wildlife

transport regulation in 1965 that is equivalent in scope to § 42(a)(1).  In relevant part,

the regulation provides:

> Any importation into or the transportation of live wildlife or eggs
> thereof between the continental United States, the District of Columbia,
> Hawaii, the Commonwealth of Puerto Rico, or any territory or
> possession of the United States by any means whatsoever, is prohibited
> except for certain purposes and under certain conditions as hereinafter
> provided in this part.

50 C.F.R. § 16.3.  The Service interprets the phrase "between the continental United

States, the District of Columbia, Hawaii, the Commonwealth of Puerto Rico, or any

territory or possession of the United States," found in 18 U.S.C. § 42(a)(1) and 50

3

C.F.R. § 16.3, to prohibit *all* interstate transportation of injurious wildlife without a permit.[1]  The Service enforces this prohibition through its law-enforcement section.

Under 18 U.S.C. § 42(a)(1), a species is "injurious" if it is harmful "to human beings, to the interests of agriculture, horticulture, forestry, or to wildlife or the wildlife resources of the United States."  A species can be listed as "injurious" for purposes of § 42(a) by either Congress or the Service.  First, Congress can amend § 42(a) to add species to the list of prohibited wildlife.  At present, that statutory list includes mongooses, certain species of fruit bats, zebra mussels, and bighead carp.  18 U.S.C. § 42(a).

Second, the Service can promulgate regulations under § 42(a) listing wildlife as injurious.  *Id.*; *see also* 50 C.F.R. §§ 16.3, 16.11–16.15.  The Service may consider a species for injurious listing on its own authority or by a petition from others.  When considering a proposed listing, the Service utilizes informal guidelines that set out factors contributing to injuriousness and measures that reduce injuriousness. *See* [Dkt.32-1 p.5–6].  Together, Congress and the Service have designated approximately 410 species that are currently listed as injurious.

---

[1] It is undisputed that § 42(a)(1) prohibits interstate transportation between Hawaii and the continental United States.  References in this brief to "interstate transport" concern transportation between the forty-nine states within the continental United States.

4

## II.    FACTUAL BACKGROUND

This appeal involves two species—reticulated pythons and green anacondas—that would devastate native ecology if they became established in the United States. The decision to list these snakes began in 2006, when officials from Florida petitioned the Service to list another large constrictor snake, the Burmese python, as injurious wildlife under the Lacey Act.  [Dkt.32-1 p.2–3].  By that time, the Burmese python had established a population in South Florida, resulting in adverse effects to native resources and wildlife.  *Id.*  Of particular concern was the large number of Burmese pythons found in Everglades National Park.  *See* 73 Fed. Reg. 5,784, 5,785 (Jan. 21, 2008).  To evaluate the potential for environmental harm from the Burmese python and other nonnative, large constrictor snakes, the Service and Everglades National Park commissioned a risk assessment from the U.S. Geological Survey.  Robert N. Reed & Gordon H. Rodda, *Giant Constrictors: Biological and Management Profiles and an Establishment Risk Assessment for Nine Large Species of Pythons, Anacondas, and the Boa Constrictor* (2009), http://pubs.usgs.gov/of/2009/1202/pdf/OF09-1202.pdf [hereinafter *Giant Constrictors*].  The Service also published a notice of inquiry soliciting from the public biological, economic, and other information and data on several species of constrictors.  73 Fed. Reg. at 5,785.

In considering whether the snakes should be listed as injurious, the Service identified and weighed factors contributing to and reducing the likelihood of injuriousness, *i.e.*, the species' likelihood of release or escape versus the ability to

prevent such escape and population establishment. [Dkt.32-1 p.5–6]. The U.S. Geological Survey also identified several characteristics of giant constrictors that "exacerbate the challenge of controlling or eradicating them," such as their large size and rapid growth, their tolerance of urbanization, and their status as a generalist with respect to habitat and predation. *Giant Constrictors* at 7. The most influential factor in the Service's decision was each species' potential to adversely affect wildlife resources by preying directly on native species. [Dkt.32-1 p.6–7].

Reticulated pythons can grow to a length of more than 28 feet—longer than any native, terrestrial animal in the United States. [Dkt.32-1 p.7]. These snakes have killed and ingested humans, most often children. *Giant Constrictors* at 93; 80 Fed. Reg. 12,702, 12,720 (Mar. 10, 2015) ("Reticulated python attacks reportedly resulted in the deaths of seven people."). Reticulated pythons are capable of parthenogenesis—a form of reproduction in which a female's unfertilized egg can hatch. [Dkt.32-1 p.7]. And reticulated pythons can lay up to 124 eggs in a single clutch. *Giant Constrictors* at 6. Consequently, the species could establish itself in the wild from even a single escaped or released python. [Dkt.32-1 p.7]. As of 2014, reticulated pythons had escaped captivity or been spotted in the wild in California, Florida, Illinois, Kansas, Maine, New Jersey, Ohio, Pennsylvania, Washington, West Virginia, and Puerto Rico. *Id.* Climate match analyses show suitable conditions for establishment of populations in southern and central Florida and the lower Rio Grande section of Texas, as well as Hawaii and America's tropical territories. *Giant Constrictors* at 96–97.

6

The green anaconda is the world's heaviest snake, regularly reaching lengths over 22 feet and weighing up to 441 pounds. *Giant Constrictors* at 216, 219; [Dkt.32-1 p.8]. As suggested by their weight, green anacondas consume a wider range of prey than Burmese and reticulated pythons, making green anacondas top predators in South America. [Dkt.32-1 p.8]. There is also anecdotal evidence of fatal attacks on humans. *Giant Constrictors* at 234. Like the reticulated python, green anacondas are capable of parthenogenesis, reproducing female clones of the mother. *Giant Constrictors* at 236–37. Climate matching shows suitable habitat in peninsular Florida, extreme south Texas, Hawaii, and Puerto Rico. *Giant Constrictors* at 237. If any of these constrictor species established themselves in the wild, "it would be extremely difficult, if not impossible to eradicate them." [Dkt.32-1 p.13]; *see also Giant Constrictors* at 42 ("[E]radication is unlikely to be successful.").

Based on the information it received, the Service proposed listing nine snake species as injurious. 75 Fed. Reg. 11,808 (Mar. 12, 2010). The Service received approximately 56,500 public comments on the proposed rule. [Dkt.32-1 p.4]. The final rule, published on January 23, 2012 ("the 2012 Rule"), listed four of the nine species as injurious. 77 Fed. Reg. 3,330 (Jan. 23, 2012); 50 C.F.R. § 16.15. Eighteen months later, the Service reopened the public comment period for the five species that were not listed in the 2012 Rule, including reticulated pythons and green anacondas. 79 Fed. Reg. 35,719 (June 24, 2014). After considering an additional 28,800 comments on those species, the Service issued a final rule ("the 2015 Rule")

listing as injurious four of the five remaining, including reticulated pythons and green anacondas. 80 Fed. Reg. 12,702 (Mar. 10, 2015). The 2015 Rule lists numerous reasons for listing each species as injurious, including the improbability of eradication and concerns that the snakes are likely to survive, become established, and spread if released; prey on and compete with native species for food and habitat (including endangered and threatened species); and disturb ecosystems beyond the point of recoverability. *Id.* at 12,715–19.

Simultaneous with the Service's listing proceedings, Congress considered whether it should amend 18 U.S.C. § 42(a)(1) to list the remaining constrictor species as injurious wildlife. On January 26, 2011, the House introduced H.R. 511, 112th Cong. (2011), which proposed the listing of all nine species of giant constrictors. A report on H.R. 511 explained that "[s]ection 42 currently prohibits the importation or interstate shipment of certain injurious animals." H. Rep. No. 112-691, at 2 (2012). H.R. 511, the report went on, would "prohibit[] the importation and interstate transport of several species of python, anaconda, and boa constrictor without a permit from [the Service]." *Id.* at 7. In the House Committee on the Judiciary, H.R. 511 was amended to add a "knowingly" mens rea requirement and to exempt exhibitors and state fish and wildlife agencies. H.R. 511, 112th Cong. (2012). This amended version of the bill was not reported out of committee.

### III.   PROCEDURAL BACKGROUND

USARK filed this suit in December 2013, challenging the 2012 Rule.  ECF No. 1.  The Complaint alleged four counts: (1) that the 2012 Rule's prohibition on interstate transportation of listed snakes was *ultra vires* under the Lacey Act; (2) that the Service failed to take a hard look at the environmental consequences of listing the snakes, as required under the National Environmental Policy Act ("NEPA"); (3) that the Service should have prepared an environmental impact statement under NEPA; and (4) that the Service acted arbitrarily and capriciously, in violation of the APA, in deciding to list the four species of constrictors.  ECF No. 1 at 19–23.  USARK was later granted leave to file a Second Amended Complaint, which added a challenge to the 2015 Rule, included four individually-named plaintiffs, and added a claim under the Regulatory Flexibility Act, 5 U.S.C. §§ 601–612.  ECF No. 27.

On April 1, 2015, USARK filed an Application for a Temporary Restraining Order, ECF No. 28, asking the court to enjoin the Service's implementation of the 2015 Rule, which was scheduled to take effect on April 9, 2015.  USARK's application raised only its challenge to the scope of the Lacey Act's injurious-wildlife provision and the Regulatory Flexibility Act claim.  *See* ECF No. 28 at 2 n.2 (explaining that those counts could be decided without an administrative record, unlike USARK's NEPA claims).  At a hearing, the court denied the application for a temporary restraining order, but converted USARK's filing to a motion for a preliminary injunction and ordered supplemental briefing.  ECF No. 37.

On May 12, 2015, the district court issued an opinion granting in part USARK's motion for a preliminary injunction. [Dkt.52 p.49]. The court held that USARK was likely to succeed on the merits of its *ultra vires* Lacey Act claim, but not on its challenge under the Regulatory Flexibility Act. [Dkt.52 p.2]. The court found that the text of 18 U.S.C. § 42(a)(1) is ambiguous, but it did not defer to the government's interpretation of that ambiguity under the two-step framework of *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). [Dkt.52 p.11–13]. Instead, it relied on legislative history from the 1960 amendment of the Lacey Act to find that Congress did not intend to prohibit interstate transport of injurious wildlife. [Dkt.52 p.19]. The court noted that "the question is close," but ultimately decided USARK was likely to succeed on the merits because the legislative history was not "sufficient to confer an authority on the [Service] that Congress did not confer when it enacted the controlling statutory text." [Dkt.52 p.1–2, 34, 49].

Addressing the other preliminary-injunction factors, the court found that "the potential for a new invasive constrictor species becoming established in any part of the United States is an extremely serious threat to the public interest—much more serious than any of the private harms asserted by Plaintiffs." [Dkt.52 p.48]. But the court decided that a narrowly tailored injunction would "likely favor" USARK. *Id.*

After additional briefing concerning the appropriate scope of an injunction, the court enjoined the implementation of the 2015 Rule as to transportation by USARK members of reticulated pythons and green anacondas between continental states other

than Florida and Texas.[2]  [Dkts. 60, 61].  The Service appeals the issuance of this injunction.

## SUMMARY OF ARGUMENT

The district court erred in finding that USARK was likely to succeed on its claim that the phrase "between the continental United States, the District of Columbia, Hawaii, the Commonwealth of Puerto Rico, or any possession of the United States," 18 U.S.C. § 42(a)(1), does not prohibit interstate transport of injurious wildlife between all states.  The Court must review the agency's interpretation under the two-step framework outlined in *Chevron*, 467 U.S. at 842–43.

At step one, traditional tools of statutory construction support the Service's interpretation that the statute does prohibit interstate transport of injurious wildlife between states of the continental United States, as well as between the continental United States and the District of Columbia, Hawaii, Puerto Rico, and other U.S. territories and possessions.  The plain language and purpose of the Lacey Act show congressional intent to regulate wildlife moving between states.  Most importantly, the Lacey Act's legislative history dating back to its original enactment in 1900 supports the Service's interpretation.  By starting its analyses with the 1960 amendment of the Act, the district court overlooked the Act's original statutory scheme, which

---

[2] The parties have stipulated to an arrangement whereby USARK issues letters to its members who intend to engage in such transportation.  The letters may be presented to the Service if a member's shipment is detained.

prohibited illegally imported species from moving in interstate commerce.  In light of this early history, the lack of discussion specific to interstate transportation during the 1960 amendment is far from dispositive.  Furthermore, Congress's silence in 1960 is outweighed by its more recent amendments of § 42(a)(1) listing the zebra mussel, brown tree snake, and bighead carp as injurious species.  Legislative history from those amendments demonstrates that Congress understood that listing those species under § 42(a)(1) would prohibit their interstate transport.  The Lacey Act's legislative history therefore shows that Congress intended to ban interstate transportation of injurious wildlife.

Even if the district court correctly presumed that the 1960 Congress did not intend to prohibit interstate transport, its recent listings constitute ratification or an implied amendment of the 1960 amendment.  The Service's interpretation of § 42(a)(1) has remained consistent since at least 1982.  Since that time, Congress has amended that provision three times, noting that it also understood § 42(a)(1) to prohibit interstate transportation of injurious species, thereby ratifying the Service's interpretation.  To the extent Congress's recent articulations of § 42(a)(1) conflict with the 1960 amendment, the recent amendments reflect specific policies and should control.

If the Court finds that the statute is ambiguous, it should turn to *Chevron* step two and defer to the Service's interpretation of § 42(a)(1) because Congress delegated to the Service the authority to enforce the injurious-wildlife provision, the Service's

interpretation is reasonable, and the Service explained the reasons for its interpretation in its listing decisions.  Furthermore, the rule of lenity does not preclude the application of *Chevron* deference because there are no concerns about fair notice or separation of powers in this case.

Finally, USARK failed to establish that its members would suffer irreparable harm outweighing the catastrophic harm that an established population of reticulated pythons and green anacondas would have on our native ecology.  For these reasons, the Court should reverse the district court's decision to enjoin implementation of the 2015 Rule.

## STANDARD OF REVIEW

Although this Court reviews the district court's weighing of the four preliminary injunction factors and its ultimate decision of whether to issue or deny relief for abuse of discretion, it reviews legal questions *de novo*, *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009), and findings of fact under the "clearly erroneous" standard, *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998).

## ARGUMENT

Because this case involves an "an agency's construction of the statute which it administers," the Court reviews the Service's interpretation of 18 U.S.C. § 42(a)(1) under the two-step framework outlined in *Chevron*, 467 U.S. at 842–43.  The first step requires the Court to ascertain the congressional intent underlying § 42(a)(1).  *Id.* at

843.  If the Court finds that "Congress has not directly addressed the precise question at issue," then the Court, at the second step, must determine whether the Service's interpretation of the scope of the interstate-transport prohibition is "based on a permissible construction of the statute" and deserving of deference.  *Id.*  Here, the Service should prevail under either *Chevron* step one or step two.

## I.    UNDER *CHEVRON* STEP ONE, PRINCIPLES OF STATUTORY CONSTRUCTION SHOW THAT CONGRESS INTENDED TO PROHIBIT INTERSTATE TRANSPORTATION OF INJURIOUS WILDLIFE UNDER THE LACEY ACT.

At *Chevron* step one, the Court must "exhaust the 'traditional tools of statutory construction' to determine whether Congress has spoken to the precise question at issue."  *Natural Res. Def. Council, Inc. v. Browner*, 57 F.3d 1122, 1125 (D.C. Cir. 1995) (quoting *Chevron*, 467 U.S. at 843 n.9).  The Court must first examine the plain language of the statutory text to see whether the statute has a plain and unambiguous meaning.  *See Chevron*, 467 U.S. at 860–61.  If the plain language of a statute is not decisive, the court then looks beyond the text for other indicia of congressional intent, "seek[ing] guidance in the statutory structure, relevant legislative history, and congressional purposes expressed" in the Lacey Act.  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 737 (1985).

### A.    The plain language of § 42(a)(1) supports the Service's interpretation.

Turning first to the plain language of the statute, the relevant portion prohibits "any shipment between the continental United States, the District of Columbia,

Hawaii, the Commonwealth of Puerto Rico, or any possession of the United States"
of injurious wildlife. 18 U.S.C. § 42(a)(1). The Service understands this phrase to
prohibit transportation between the States, as well as between the States and any U.S.
territory or possession; USARK believes the statute prohibits only transportation to
or from one of the forty-eight contiguous States and the District of Columbia, Hawaii,
Puerto Rico, or another American territory. Affording words of § 42(a)(1) their
common and approved usages, *see Palestine Info. Office v. Shultz*, 853 F.2d 932, 938 (D.C.
Cir. 1988), the plain text of the statute supports the Service's construction of the
injurious-wildlife provision.

First, Congress's use of the disjunctive "or" to separate the listed geographic
entities supports the Service's interpretation. Under traditional canons of statutory
construction, the disjunctive "or" separates words or phrases in an alternate
relationship, indicating that either of the separated words or phrases may be employed
without the other. *See* 1A Norman B. Singer & J.D. Shambie Singer, Sutherland
Statutory Construction § 21:14 (7th ed. 2009); *see also Reiter v. Sonotone Corp.*, 442 U.S.
330, 339 (1979) ("Canons of construction ordinarily suggest that terms connected by a
disjunctive be given separate meanings…."). Here, Congress's use of "or" affords
each listed locality independent significance, *see Reiter*, 442 U.S. at 338–39, such that
shipments of injurious wildlife are prohibited between each one, including shipments
between "the continental United States." By contrast, USARK's interpretation
requires not only a change of "or" to "and," but also moving that conjunction earlier

15

in the clause to prohibit shipment only "between the continental United States" *and* any of the enumerated locales. "While there may be circumstances which call for an interpretation of the words 'and' and 'or,' ordinarily these words are not interchangeable." 1A Sutherland Statutory Construction § 21:14.

Second, listing the District of Columbia in addition to the "continental United States" compels the Service's interpretation that the phrase "continental United States" refers to each of those States separately. The District of Columbia is listed separately not because it is an island within the larger entity of the "continental United States," but because Congress wanted to include each political entity that is potentially involved in the interstate commerce of injurious species. Under USARK's reading of § 42(a)(1), an individual transporting listed wildlife from Virginia to Maryland would violate the statute if he drove through the District, but not if he drove around the Beltway. *See* [Dkt.52 p.14]. That kind of distinction is unrelated to any conceivable purpose of the Lacey Act, and therefore works an absurdity. "[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors*, 458 U.S. 564, 575 (1982). Here, the Service's interpretation avoids the absurd result that USARK's reading would generate.

The district court acknowledged that the Service's interpretation found support in the plain language of the statute and avoided any absurdities. [Dkt.52 p.14]. But the court concluded that the Lacey Act's statutory structure favored USARK's

16

interpretation because the 1960 version of the Act's trade provision[3] prohibited shipment "to or from any State, territory, the District of Columbia, the Commonwealth of Puerto Rico, any possession of the United States, or any foreign country." [Dkt.52 p.15]. To reach its conclusion, the district court assumed the language in the trade provision was the *only* way for Congress to prohibit interstate movement, and because the injurious-wildlife provision used different phrasing, it could not *also* refer to interstate movement. Although Congress amended both provisions in 1960, they differed in both their original and post-amendment language, precluding any point of comparison. *See* S. Rep. No. 86-1883, at 5–6 (1960) (showing the original language of the statutes in brackets and the amended language in italics). Even if the language in the two provisions was identical, the Supreme Court recently cautioned that "identical language may convey varying content when used in different statutes, sometimes even in different provisions of the same statute." *Yates v. United States*, 135 S. Ct. 1074, 1082 (2015) (collecting cases). Furthermore, as discussed *infra* Part I.C.1, the legislative history of these two provisions show that the different text of those sections does not compel a different "plain-language" interpretation. The district court therefore erred in finding that the plain language of the injurious-wildlife provision did not support the Service's interpretation.

---

[3] The trade provision was originally enacted as Section 3 of the Lacey Act. Ch. 553, § 3, 31 Stat. 188 (1900). It is now found at 16 U.S.C. § 3372 and prohibits the illegal commercial trade of wildlife, fish, and plants.

**B.    The purpose of the Lacey Act supports the Service's interpretation of the Act's injurious wildlife provision.**

If the Court agrees with the district court ([Dkt.52 p.15]) that the plain text of 18 U.S.C. § 42(a)(1) is not decisive, then the Court should look beyond the text for other indicia of congressional intent.  *See Staples v. United States*, 511 U.S. 600, 605 (1994).  To determine the meaning of a statute, courts may look "to its object and policy."  *Crandon v. United States*, 494 U.S. 152, 158 (1990).  One purpose of the Lacey Act is "to regulate the introduction of American or foreign birds or animals in *localities* where they have not heretofore existed."  16 U.S.C. § 701 (emphasis added).  The Act states that "localities" are the geographic entities that should be protected, not merely large territories like the entire continental United States or an entire insular territory.  To protect localities, Congress could not have intended to cabin the Service's authority to prohibit only the transport of injurious wildlife from the District of Columbia, Hawaii, Puerto Rico and other U.S. territories to the continental United States.

USARK's interpretation does not serve this purpose of the Act—it would protect localities within the continental United States from an injurious species transported from Hawaii or the District of Columbia, but not from any other state.  Indeed, there is no reason to believe an injurious species transported from Hawaii or the District of Columbia poses more risk to localities than an injurious species from Florida or any other state within the continental United States.  In *King v. Burwell*, 135

S. Ct. 2480, 2493 (2015), the Supreme Court emphasized that courts should not interpret statutes to negate the intent underlying their enactment. *See also New York State Dep't of Social Servs. v. Dublino,* 413 U.S. 405, 419–20 (1973) ("We cannot interpret federal statutes to negate their own stated purposes."). Here, one purpose of the Lacey Act was clearly to prevent the spread of wildlife to "localities" where they do not yet exist. 16 U.S.C. § 701. Without a prohibition on interstate transport, the Service could not fulfill that purpose.

## C. Legislative history shows that Congress intended to prohibit interstate transport of injurious wildlife from the time the Lacey Act was first enacted.

The legislative history of 18 U.S.C. § 42 demonstrates that Congress intended to prohibit all interstate transportation of injurious species. The district court erred in finding that the Lacey Act's legislative history supported USARK's reading of the injurious-wildlife provision because it considered the 1960 amendments to the Lacey Act to be the only relevant enactment. *See* [Dkt.52 p.30]. But the Lacey Act was enacted in 1900. The court's decision to begin its review with the 1960 amendments wrongly assumed that Congress had not previously expressed an intent to prohibit interstate transportation of injurious species. *See* [Dkt.52 p.15, 16] (incorrectly stating that "[p]rior to the 1960 amendments," the Lacey Act "did not address the[] domestic transportation" of listed species). In fact, the original enactment and early amendments to the Lacey Act clearly demonstrate that Congress, from the beginning, intended to regulate interstate transportation of foreign species.

19

1.    *Initial Enactment through 1948*

At the time of the Lacey Act's inception in 1900, the injurious-wildlife

provision was found in Section 2 and contained both (1) a blanket prohibition on the

unpermitted importation of any foreign wildlife and (2) a specific prohibition against

importing mongooses, fruit bats, English sparrows, starlings and any species that the

Secretary of Agriculture "declare[d] injurious to the interest of agriculture or

horticulture."  § 2, 31 Stat. at 188.  Section 3 contained an early version of the trade

provision, which is now codified at 16 U.S.C. § 3372.  *See* § 3, 31 Stat. at 188

(prohibiting transportation by common carrier of "the dead bodies or parts thereof of

any wild animals or birds, where such animals or birds have been killed in violation of

the laws of the State, Territory, or District in which the same were killed").  But

Section 3 also included the following ban on transporting illegally imported wildlife:

> [I]t shall be unlawful for any person or persons to deliver to any
> common carrier, or for any common carrier to transport from one State
> or Territory to another State or Territory, or from the District of
> Columbia or Alaska to any State or Territory, or from any State or
> Territory to the District of Columbia or Alaska, any foreign animals or
> birds the importation of which is prohibited….

*Id.*  The injurious-wildlife provision in Section 2 criminalized the unpermitted

importation of all foreign species, including those specifically enumerated or

designated as injurious.  And Section 3 prohibited the shipping of illegally imported

species by common carrier.  Together, Sections 2 and 3 banned all interstate

transportation of foreign species imported without a permit, including any foreign

species designated as injurious.  Consistent with its stated goals for the Lacey Act, *see* § 1, 31 Stat. at 188, Congress's enactment of the Lacey Act provided for regulation of the introduction of certain injurious species in "localities where they have not heretofore existed" by prohibiting the interstate movement of such animals.

Congress first amended the Lacey Act in 1909, making only stylistic alterations. Ch. 9, §§ 241, 242, 35 Stat. 1134, 1137 (1909).  Section 2 merely flipped the order of its two prohibitions, placing the specific ban on listed wildlife before the blanket prohibition.  § 241, 35 Stat. at 1137.  Similarly, there were no substantive changes to Section 3, meaning the 1909 version of the Lacey Act continued to regulate interstate transportation of certain injurious wildlife by common carrier.  § 242, 35 Stat. at 1137.

In 1948, Congress again amended portions of the Lacey Act and codified the Act in the criminal code of Title 18—the injurious-wildlife provision became 18 U.S.C. § 42 and the trade provision was codified at 18 U.S.C. § 43.  Ch. 645, 62 Stat. 687 (1948).  Again, the alterations to the injurious-wildlife provision were minimal. *See* § 42, 62 Stat. at 687; *see also* H. Rep. No. 80-304, at A9–A10 (1947) (describing the changes to the statute).  The trade provision was amended to criminalize

> deliver[y] or knowing[] recei[pt] for shipment, transportation, or carriage in interstate or foreign commerce, any wild animal or bird, or the dead body or part thereof, or the egg of such bird imported from any foreign country, or captured, killed, taken, purchased, sold or possessed contrary to any Act of Congress, or law of any State, Territory, Possession, or foreign country, or subdivision thereof….

§ 43, 62 Stat. at 687.  Although this amendment is hardly a model of clarity, there is every indication that the 1948 Congress intended for the Service to continue regulating the interstate movement of certain imported species, including imported injurious species.[4]  *See* H. Rep. No. 80-304, at A10 (1947) (describing the amendments to § 43 without any mention of an intent to alter the meaning of the statute).

2.     *1960 Amendments*

In 1960, Congress again amended both sections "to clarify certain provisions of the Criminal Code relating to the importation or shipment of injurious mammals, birds, amphibians, fish, and reptiles."  H. Rep. No. 86-1823, at 1 (1960); Pub. L. No. 86-702, §§ 42–43, 74 Stat. 753, 753–55 (1960).  The 1960 amendments added to § 42 the language proscribing transport of injurious wildlife "between the continental United States, the District of Columbia, Hawaii, the Commonwealth of Puerto Rico, or any possession of the United States."  § 42, 74 Stat. at 753–54.  At the same time, Congress removed from the trade provision any mention of importation and limited its regulations on foreign species to movement "to or from…any foreign country,"

---

[4] The 1948 amendment could be read to prohibit transportation in interstate commerce of "any wild animal or bird, or the dead body or part thereof, or the egg of such bird imported from any foreign country."  § 43, 62 Stat. at 687.  That reading would be the equivalent of a ban on interstate commerce involving any foreign species.  Alternatively, if the phrase "contrary to any Act of Congress" modifies "imported from any foreign country," then § 43 prohibits species that were imported in violation of § 42 from being transported in interstate commerce, thereby retaining the regulation on illegally imported species.  *Id.*  Either reading regulates interstate transport of certain injurious species.

thereby eliminating any prohibition on the interstate transportation of foreign species that are already in the United States. § 43, 74 Stat. 754.

But there is no indication that Congress did *not* intend to continue regulating interstate transportation of such species by means of another section. One explicit purpose of the 1960 amendments was "to reduce more effectively the hazards arising from the importation of injurious wild animals [and] to curtail traffic in such species." H. Rep. No. 86-1823, at 1–2 (1960). Given that Congress intended to more effectively curtail traffic in imported, injurious wildlife, and that Congress considered the 1960 amendments to be "technical in nature," *id.*, it is reasonable to conclude that Congress intended the disputed language in § 42 to continue the prohibition against interstate transport of imported species. Furthermore, the broader scope of the prohibition in the amended § 42(a)(1), which applies with equal force to injurious species that are imported and those already present in the United States, is not inconsistent with the legislative history of the 1960 amendments. *See H.R. 10329 and H.R. 10598: Hearing Before the House Comm. on the Judiciary*, 86th Cong. 6 (1960) [hereinafter "1960 Hearing"] (explaining that the amendment "broadened the language a bit").

In finding that the legislative history from the 1960 amendments comported with USARK's reading of § 42(a)(1), the district court looked at individual statements from one employee at the Department of the Interior. [Dkt.52 p.15–17]. Lansing Parking served as Assistant Director of the Bureau of Sport Fisheries and Wildlife.

*Id*; 1960 Hearing at 3–13.  During his testimony, Mr. Parker described the proposed amendment to § 42 as "prohibit[ing] the shipment between the Continental United States and Hawaii, Puerto Rico, and the Virgin Islands *of the Mongoose*."  1960 Hearing at 6 (emphasis added).  "The Mongoose," Mr. Parker explained, is found "in Hawaii, Puerto Rico, and the Virgin Islands, and we have no desire to have them introduced in the United States."  *Id.*  The district court found this description of § 42 dispositive as to Interior's position on the challenged language.  [Dkt.52 p.16].  But because Mr. Parker chose to make his point using the example of the mongoose, which then resided only in Hawaii, Puerto Rico, and the Virgin Islands, that example alone says nothing about whether transportation among the various continental states is or is not prohibited.  1960 Hearing at 6.  The district court erred in extrapolating that single statement about one species to Interior's position on the injurious-wildlife provision as a whole.[5]  *See March v. United States*, 506 F.2d 1306, 1314 n.30 (D.C. Cir. 1974)

---

[5] The district court also cited a 1973 proposal from the Department of the Interior to rewrite the injurious-wildlife provision to prohibit all imported species by default. [Dkt.52 p.18].  Presenting these proposed changes to a House subcommittee, the special-agent-in-charge of the Service's Division of Law Enforcement testified: "[T]here is no restriction that we find in section 42 of the Lacey Act to interstate shipments, with the possible exception of restrictions from areas off the continental United State, such as Puerto Rico, the Virgin Islands, and Hawaii."  *Proposed Injurious Wildlife Regulations: Hearing Before the Subcomm. on Fisheries & Wildlife Conservation and the Env't of the H. Comm. on Merchant Marine & Fisheries*, 93d Cong. 151 (1974).  That statement is of very little use in deciding the *Chevron* step one question here.  The proposed regulations did not affect domestic shipments, the statement is not one of congressional intent, and neither the agency nor Congress took any action to adopt these rules.

("The individual opinions of witnesses at hearings are of dubious value in interpretation of legislation."  (Citations omitted.)).

Rather than focusing on one-off statements in congressional testimony that have been taken out of context, the court should look to legislative history for evidence of Congress's original intent.  Here, it is clear that Congress intended to prevent injurious species from gaining a foothold in the United States.  Congress removed from § 42 any reference to starlings and English sparrows because, from the fifty sparrows introduced in 1890, the species had "spread throughout almost all the United States" and could no longer be controlled.  1960 Hearing at 7.  Congress acknowledged that the starling was "quite a problem and [was] becoming more of a problem all over the United States."  *Id.* at 8.  Mr. Parker and other witnesses noted an increasing importation and interest in foreign species, specifically mentioning venomous snakes, and the amendment to § 42 was intended to prevent other species from following suit.  *Id.* at 3-A-2, 4–5, 21.  Congress believed that, under the amendment, "it would be utterly impossible for the kinds of reptiles, et cetera, that would be injurious to come into the United States" and that "irresponsible people could not bring in things nilly-willy that, if liberated, would present difficulties."  *Id.* at 16–17.

This greater discussion shows that Congress intended for the Lacey Act to continue to prevent injurious species from establishing populations in the United States.  Congress removed language from § 43 that prohibited foreign species in

25

interstate commerce, and it added language to § 42—the section most directly concerned with injurious species.  It is only logical to conclude that Congress considered these changes together, intending § 42 to continue regulating interstate transportation and broadening the scope of that prohibition to include all injurious species.

The district court also cited the lack of discussion about expanding the scope of criminal activity under § 42 and specific enforcement mechanisms as evidence that Congress did not intend for the injurious-wildlife provision to prohibit interstate transport of listed wildlife.  [Dkt.52 p.17–18].  Again, this rationale loses support in light of the fact that the Lacey Act *did* prohibit interstate transportation of illegally imported wildlife from the Act's inception as part of the trade provision.  With that history in mind, Congress's descriptions of the 1960 amendment as "technical in nature," *see* H. Rep. No. 86-1823, at 2 (1960), and broadening the language only "a bit," 1960 Hearing at 6, take on new meaning.  The fact that there is no direct mention of interstate transportation in the committee hearings and reports indicates that Congress intended to continue regulating interstate transportation of certain species, as it clearly articulated in 1900.

### 3.     *Legislative History from the Last Quarter-Century*

Like the 1900 Congress enacting the Lacey Act, recent Congresses have clearly expressed their intent to prohibit interstate transport of injurious species.  Since 1960, Congress has amended 18 U.S.C. § 42(a)(1) three times to designate new species as

injurious wildlife. The legislative history of each of these amendments shows that Congress was aware of the Service's interpretation of the injurious-wildlife provision, and that Congress understood that it was banning the interstate transportation of injurious species.

> a.    *The Service clearly expressed its understanding of § 42(a)(1) in 1982.*

The Service has read § 42(a)(1) to prohibit interstate transport of injurious wildlife for more than 30 years. In 1982, the Service indicated that it interpreted the Lacey Act to authorize a ban on the interstate transport of injurious wildlife when the Service listed the raccoon dog under 50 C.F.R. § 16.11. *See* 47 Fed. Reg. 56,360 (Dec. 16, 1982). The final rule listing the raccoon dog mirrors the language of 18 U.S.C. § 42(a)(1), "prohibiting import into, acquisition and transportation between the continental United States, the District of Columbia, Hawaii, the Commonwealth of Puerto Rico, or any territory or possession of the United States." 47 Fed. Reg. at 56,360. But in its accompanying environmental analysis, the Service explained its interpretation of that language: "The interstate transportation of live raccoon dogs currently held in the United States for fur farm propagation, or for any purpose not otherwise permitted, would be prohibited." U.S. Dep't of the Interior, *Proposal by the Fish and Wildlife Service to Prohibit Importation of the Raccoon Dog,* Nyctereutes procyonoides*, Into the United States* 9 (1982), http://www.fws.gov/injuriouswildlife/ pdf_files/Raccoon_dog_EA_and_FONSI.pdf [hereinafter "Raccoon Dog EA"].

The Service again articulated its view of the scope of the injurious-wildlife provision in 1989—this time in a final rule listing the mitten crab as injurious. 54 Fed. Reg. 22,286, 22,287 (May 23, 1989) ("The interstate transportation of any live mitten crabs or viable eggs thereof that currently may be held in the United States for purposes such as aquaculture propagation or for human consumption, or for any purpose not otherwise permitted, would be prohibited.").

> b.      *Congress intended to prohibit the interstate transportation of zebra mussels in 1990 and brown tree snakes in 1991.*

A year later, Congress expressed the same interpretation as the Service. In 1990, Congress enacted the Nonindigenous Aquatic Nuisance Prevention and Control Act of 1990, 16 U.S.C. § 4701, which established a new federal program to prevent and control the spread of the zebra mussel and other nonindigenous aquatic nuisance species. As relevant here, the law amended 18 U.S.C. § 42(a) to add the zebra mussel to the list of injurious species. Pub. L. No. 101-646, § 1208, 104 Stat. 4761 (1990). Congress understood that prohibiting interstate transportation was necessary to prevent uncontrolled proliferation of the zebra mussel. S. Rep. No. 101-523, at 2 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6455, 6456 (cautioning that the zebra mussel was "expected to continue to spread to two-thirds of the Nation's fresh water systems if left unchecked"); *The Nonindigenous Aquatic Nuisance Act of 1990: Hearing Before the Subcomm. on Envtl. Protection of the Senate Comm. on Env't & Pub. Works*, 101st Cong. 5–6 (1990) (statement of Sen. Kohl) (noting that the zebra mussel can survive out of

water, allowing it to be spread by land such that "[e]very river and lake in the United States could eventually be infested with the Zebra Mussel").  One author, Senator John Glenn, explained that his bill "amend[ed] the Lacey Act to prevent the interstate transportation of the zebra mussel."  136 Cong. Rec. S17147 (daily ed. Oct. 26, 1990) (statement of Sen. Glenn); *see also The Nonindigenous Aquatic Nuisance Act of 1990: Hearing Before the Subcomm. on Envtl. Protection of the Senate Comm. on Env't & Pub. Works*, 101st Cong. 4 (1990) (statement of Sen. Glenn) (explaining that zebra mussels "do not respect State or national boundaries" and that his bill "would declare the Zebra Mussel an injurious species to prevent intentional transport of this most harmful organism").  It is therefore clear that Congress believed listing the zebra mussel under § 42(a)(1) would criminalize the interstate transportation of the mussels.[6]  *See* S. Rep. No. 101-523, at 10 (1990), *reprinted in* 1990 U.S.C.C.A.N. at 6464 (stating that "declar[ing] the zebra mussel an injurious species…would lead to the prohibition of the interstate transport of zebra mussels").

---

[6] The district court erroneously concluded that testimony from the Assistant Secretary for Fish and Wildlife and Parks, Constance Harriman, "injects at least some uncertainty into the 1990 legislative record."  [Dkt.52 p.22].  But when reviewing legislative history to ascertain congressional intent, the Court should not elevate testimony from a single witness over statements from the bill's author.  *See Ginsburg, Feldman & Bress v. Fed. Energy Admin.*, 591 F.2d 717, 724 n.14 (D.C. Cir. 1978) (dismissing testimony from a government official and instead finding a conflicting statement from the congressman authoring the bill to be authoritative).  The district court should have found that Congress's statements in the House and Senate Reports for the Nonindigenous Aquatic Nuisance Act, which read § 42(a)(1) to ban interstate transport, are authoritative and allow for no uncertainty.

In addition to listing the zebra mussel, the Nonindigenous Aquatic Nuisance Act established a task force under the joint supervision of the Service and the National Oceanic and Atmospheric Administration.  *See* S. Rep. No. 101-523, at 6 (1990), *reprinted in* 1990 U.S.C.C.A.N. at 6457–58.  The task force was asked to "undertake a comprehensive, environmentally sound program of prevention, research and control specifically directed at the brown tree snake."  *Id.* at 10, 1990 U.S.C.C.A.N. at 6464.  Earlier that year, the Service undertook rulemaking procedures to list the brown tree snake as injurious under 50 C.F.R. § 16.15(a)(1).  In the final rule listing the brown tree snake, the Service explained: "The interstate transportation of any live brown tree snakes or viable eggs thereof currently held in the United States for any purpose not permitted is prohibited."  55 Fed. Reg. 17,439, 17,440 (Apr. 25, 1990).

One year after the Service's listing and the establishment of the task force, Congress amended 18 U.S.C. § 42(a)(1) to add the brown tree snake to the list of prohibited wildlife.  Pub. L. No. 102-237, § 1013(e), 105 Stat. 1901 (1991).  The legislative history accompanying this amendment makes only passing references to § 42(a)(1).  Nevertheless, Congress's interest in brown tree snakes the previous year and its decision to appoint a task force under the Service's supervision suggests that Congress was aware of and agreed with the Service's interpretation of § 42(a)(1).

30

c.    *From 2002 to 2010, Congress expressed its understanding that listing Asian carp under § 42(a)(1) would prohibit interstate transport.*

Like the brown tree snake, Congress's listing of bighead carp as injurious followed the Service's listing of three species of invasive carp in 2007.  *See* 50 C.F.R. § 16.13(a)(2)(v); 72 Fed. Reg. 59,019 (Oct. 18, 2007) (black carp); 72 Fed. Reg. 37,459 (July 10, 2007) (silver and largescale silver carp).  The Service first considered listing Asian carp species[7] in response to a 2002 letter from 25 members of Congress from the Great Lakes region.  *See* [Dkt.44-2 p.1–3].  These representatives asked the Service to list Asian carp "as injurious species under the Lacey Act," because, as these members of Congress understood § 42(a)(1), "[l]isting these fish would prohibit the importation of new carp into the country *and prohibit interstate transportation*."  *Id.* at 1 (emphasis added).  And in the final rules listing Asian carp species as injurious, the Service prohibited the importation and interstate transport of black, silver, and largescale silver carp.  *See* 72 Fed. Reg. at 59,019, 59,021, 59,023, 59,025–27, 59,034; 72 Fed. Reg. at 37,460–61, 37,469.

_____

[7] The term "Asian carp" encompasses several species of invasive fish (including bighead carp, black carp, grass carp, and silver carp) that were introduced in the United States in the 1960s and 1970s to control weed and parasite growth in aquatic farms.  *See* Stern et al., Cong. Research Serv., R41082, *Asian Carp and the Great Lakes Region* 1–4 (2014).  The carp escaped, making their way to the Mississippi River and its tributaries.  *Id.*  Asian carp have been found as far north as Minnesota, and concern has been expressed that the carp will enter the Great Lakes from the Mississippi through the Chicago Area Waterway System, posing a significant threat to commercial and recreational fisheries in the Great Lakes.  *Id.* at 1, 6.

Because the Service did not list the bighead carp in 2007, the Great Lakes representatives again petitioned the Service in 2009, offering the same rationale that adding bighead carp to the list of injurious species would "prohibit interstate transportation." [Dkt.44-3 p.1]. Before the Service issued its final rule listing bighead carp under 50 C.F.R. § 16.13 in 2011, Congress itself enacted the Asian Carp Prevention and Control Act, which amended 18 U.S.C. § 42(a)(1) to add the bighead carp as an injurious species. Pub. L. No. 111-307, § 2, 124 Stat. 3282 (2010). Hearings before both chambers of Congress concerning that bill referenced the Service's previous listing of Asian carp species, showing Congress's familiarity with the Service's rules on those fish.[8] And like the Service, Congress understood that "[i]f a species is listed as injurious, importation and interstate transfer of these fish is prohibited unless authorized through a permit from the U.S. Fish and Wildlife Service." H. Rep. No. 109-585, at 5, 22, 23 (2006); *see also* S. Rep. No. 111-181, at 2, 3 (2010). The aim of the legislation was to prevent the further spread of the carp within the continental United States, particularly into the Great Lakes. H. Rep. No. 109-585, at 2 (2006); S. Rep. No. 111-181, at 1–2 (2010). As with the zebra mussel, Congress

---

[8] *See Asian Carp and the Great Lakes: Hearing Before the Subcomm. on the Water Res. and Env't of the H. Comm. on Transp. & Infrastructure*, 111th Cong. 21 (2010) (statement of Rebecca Humphries, Dir. of Mich. Dep't of Natural Res. & Env't); *Asian Carp: Hearing Before the Subcomm. on Water & Power of the Senate Comm. on Energy & Natural Res.*, 111th Cong. 9 (2010) (statement of Leon Carl, U.S. Geological Survey, Dep't of the Interior).

accomplished this prohibition only by listing the species; it did not need to change the language indicating what acts were prohibited.

> d.    *Other legislative material showing Congress's understanding of § 42(a)(1).*

Although Congress has not added any species to the list of injurious wildlife in § 42(a)(1) since the bighead carp in 2010, it has discussed its interpretation of that provision in other contexts. In 2012, Congress amended the Clean Water Act to, among other things, exempt certain water transfers from the injurious-wildlife provision of the Lacey Act. *See* Pub. L. No. 112-237, § 5, 126 Stat. 1628 (2012). The North Texas Municipal Water District operates a pump station that transfers water between two lakes (Lake Texoma and Lake Lavon). In 2010, the Service advised the North Texas Municipal Water District that, due to boundary renegotiations in 2000, a portion of the water district's facilities is now located in Oklahoma. Zebra mussels were identified in Lake Texoma in 2009 and, as a result of the revised boundaries, the Service considered use of the pump station a violation of § 42(a)(1) because the water transfers constituted interstate transportation of zebra mussels. *See* H. Rep. No. 112-657, at 2–4 (2012).

In response to the Service's report, Congress exempted these water transfers from the Lacey Act. This law would not have been necessary if Congress did not recognize § 42(a)(1) as prohibiting the transportation of injurious species between states within the continental United States. *See* H. Rep. No. 112-657, at 2 (2012)

(stating that injurious species "may not be…transported between the states, the District of Columbia, Hawaii, or any territory or possession of the United States"). Furthermore, interpreting § 42(a)(1) to prohibit only those domestic transfers between the continental and noncontinental United States would render the North Texas Zebra Mussel Barrier Act superfluous, in violation of the canon against superfluities. *See Bilski v. Kappos*, 561 U.S. 593, 607–08 (2010) (noting that "the canon against interpreting any statutory provision in a manner that would render another provision superfluous…applies to interpreting any two provisions in the U.S. Code, even when Congress enacted the provisions at different times").

      e.     *The weight of the Lacey Act's legislative history supports the Service's interpretation.*

The long history of § 42(a)(1) raises the question of how much weight any particular enactment should have in determining whether Congress unambiguously intended to prohibit the interstate transportation of injurious species.  The district court focused solely on the 1960 amendment, discounting more recent amendments as post-enactment legislative history ([Dkt.52 p.19, 27]), which can be "an unreliable guide to legislative intent," *N. Broward Hosp. Dist. v. Shalala*, 172 F.3d 90, 98 (D.C. Cir. 1999) (citations omitted); *but see Parker v. Califano*, 561 F.2d 320, 339 (D.C. Cir. 1977); *United States v. Gen. Motors Corp.,* 518 F.2d 420, 436–37 (D.C. Cir. 1975).

The court's focus on the 1960 amendment was too narrow.  This Court has said that the legislative history of a statute's *original* enactment "is the better source for

determining Congress's intent," and not the legislative history of an amendment, even one that established the present wording of a provision. *Id.*; *see also Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n.13 (1980) ("[S]ubseqent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment."). Similarly, the Supreme Court has noted that subsequent legislative history may be more valuable when it accompanies an amendment related to the statutory provision. *Mackey v. Lanier Collection Agency & Serv., Inc.,* 486 U.S. 825, 840 (1988). Both the original enactment of the Lacey Act, which regulated the interstate transport of imported injurious species, and Congress's efforts since 1960 to prohibit the interstate transport of particular injurious species are, therefore, highly relevant. In focusing on Congress's silence in the 1960 amendments, the district court ignored almost a century's worth of legislative history. This Court should therefore find that the district court erred in finding that the 1960 amendments unambiguously foreclosed the Service's reading of § 42(a)(1). The Court should instead conclude that the Lacey Act's legislative history shows congressional intent to ban all interstate transportation of injurious wildlife.

### D. Alternatively, recent Congresses ratified or impliedly amended 18 U.S.C. § 42(a)(1) to comport with the Service's longstanding interpretation.

Although the injurious-wildlife provision, particularly when considered along with its legislative history, clearly shows that Congress continuously intended to

regulate interstate transport from 1900 to the present, there is another basis on which the district court should have upheld the Service's interpretation of 18 U.S.C. § 42(a)(1). Even if the district court's assumptions about Congress's intent during the 1960 amendment are correct, Congress's recent enactments listing the zebra mussel, brown tree snake, and bighead carp constitute a ratification or implied amendment of the 1960 amendment.

### 1.    *Ratification*

Congressional ratification occurs when "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Pub. Citizen, Inc. v. U.S. Dep't of Health & Human Serv.*, 332 F.3d 654, 668 (D.C. Cir. 2003) (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 382 n.66 (1982)). There are three criteria for ratification. First, Congress must have amended or reenacted the statute. *See Barnhart v. Walton*, 535 U.S. 212, 220 (2002). Second, there must be "some evidence of (or reason to assume) congressional familiarity with the administrative interpretation at issue." *Pub. Citizen*, 332 F.3d at 669. Finally, the agency's challenged interpretation must have remained consistent throughout the period of ratification. *Id.*; *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000).

### a.    *Congress has amended § 42(a)(1).*

Turning to the first factor, Congress has amended § 42(a)(1) three times since the 1960 amendments. *See* Pub. L. No. 101-646, § 1208, 104 Stat. 4761 (1990) (zebra

mussel); Pub. L. No. 102-237, § 1013(e), 105 Stat. 1901 (1991) (brown tree snake); Pub. L. No. 111-307, § 2, 124 Stat. 3282 (2010) (bighead carp). When listing the zebra mussel and bighead carp, the legislative history repeatedly demonstrates that Congress intended to criminalize the interstate transport of those species, and that merely listing the species as injurious would achieve that result. Therefore, Congress's recent amendments of the injurious-wildlife provision satisfy the first requirement for ratification.

The district court mischaracterized the law when it held that Congress must either reenact the entire Lacey Act or amend the relevant *language* in § 42(a)(1) to ratify the prohibition on interstate transport. [Dkt.52 p.28]. The Supreme Court has repeatedly found that "Congress intended [an] [a]gency's interpretation, or at least understood the interpretation as statutorily permissible" when Congress has "frequently amended or reenacted the relevant provisions without change."[9] *Barnhart*, 535 U.S. at 220. And the cases that the district court cited are inapposite. In *Public Citizen, Inc. v. U.S. Department of Health and Human Services*, 332 F.3d at 669, this Court declined to find ratification when some sections of the Peer Review Improvement Act were amended, but not the section challenged in the lawsuit. And in *Alexander v. Sandoval*, 532 U.S. 275, 293 (2001), not only had the relevant section of Title VI not

---

[9] *See also Commodity Futures Trading Com'n v. Schor*, 478 U.S. 833, 846 (1986); *Grove City College v. Bell*, 465 U.S. 555, 564–67 (1984), *superseded by statute*, Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28 (1988); *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275 (1974); *United States v. Bergh*, 352 U.S. 40, 46–47 (1956).

been amended, but the Supreme Court found that "[n]either as originally enacted nor as later amended does Title VI display an intent to create a freestanding private right of action."

This case is more similar to those instances in which courts have found that an amendment constituted ratification. In *North Haven Board of Education v. Bell*, 456 U.S. 512, 517 (1982), for example, public schools challenged an agency's authority to issue regulations prohibiting employment discrimination, arguing that the word "persons" in the statutory language of Title IX did not include employees. The Supreme Court concluded that legislative history from the relevant section's enactment was "sparse," *id.* at 527, but found it significant that Congress was aware of the agency's interpretation and had subsequently amended the statute on numerous occasions without disturbing the provision at issue, *id.* at 530. The Court noted that "[w]here an agency's statutory construction has been fully brought to the attention of the public and the Congress and the latter has not sought to alter that interpretation although it has amended the statute *in other respects*, then presumably the legislative intent has been correctly discerned." *Id.* at 535 (emphasis added) (citations omitted).

The case for ratification here is even stronger than in a situation where Congress has ratified an agency interpretation by merely leaving the statute alone. Here, although Congress did not amend 18 U.S.C. § 42(a)(1)'s *general* prohibition on shipment "between the continental United States," it *specifically* added the zebra mussel and bighead carp to § 42(a)(1) for the express purpose of limiting their interstate

transport.  These amendments demonstrate that Congress sought to trigger the

Service's interpretation and believed that it could prohibit the interstate transport of

species simply by listing them as injurious.  Congress therefore ratified the Service's

interpretation of the meaning of the statute when Congress amended the list of

injurious species in 1990 and 2010.  Indeed, the district court itself acknowledged that

Congress had "*assumed* that the Lacey Act applied to interstate shipments—

presumably based on input from the Department of the Interior, which by 2010 had

adopted that interpretation of the law."  [Dkt.52 p.35].

> b.     *Congress was familiar with the Service's interpretation.*

Turning to the second factor, there is no dispute that Congress (1) was aware

of the Service's interpretation, (2) has acted consistent with that interpretation since

1990, and (3) has never disapproved of the Service's interpretation.  The Service listed

the brown tree snake and three species of Asian carp by regulation before Congress

did the same by statute, thereby alerting Congress to the agency's understanding of its

regulatory authority.  *See* 72 Fed. Reg. at 37,460; 72 Fed. Reg. at 59,023.  Congress

echoed this understanding in its listing of the zebra mussel and bighead carp,

explaining that it intended to prohibit interstate transport of those species and knew it

had delegated to the Service the authority to ban interstate transportation.  And in

2012, when it exempted the Lake Texoma water transfers from Lacey Act

enforcement under § 42(a)(1), Congress believed the Act prohibited interstate

transport of the zebra mussel.  Thus, on four separate occasions in the last quarter-

century, Congress has enacted legislation demonstrating that it agrees with the

Service's reading of the interstate transportation provision of section 42(a)(1).

> c.    *The Service's interpretation has been consistent since 1982.*

Finally, the third ratification factor is satisfied here because the Service's

interpretation of the § 42(a)(1) has remained consistent since 1982, which fully

encompasses the period of ratification from 1990 through 2012.  The Service first

publicly articulated its understanding that § 42(a)(1) prohibits interstate transport in its

1982 Environmental Assessment studying the effects of listing the raccoon dog.  *See*

Raccoon Dog EA at 9.  Since that time, each of the Service's final rules listing

injurious wildlife have stated that the listing will prohibit interstate transportation of

the species.[10]

The fact that the agency did not previously articulate this position does not

defeat its ratification argument.  The Supreme Court has recognized that "an agency's

initial interpretation of a statute that it is charged with administering is not carved in

stone" and "agencies must be given ample latitude to adapt their rules and policies to

---

[10]  *See, e.g.*, 54 Fed. Reg. 22,286, 22,287 (May 23, 1989) (mitten crab); 55 Fed. Reg. 17,439, 17,440 (Apr. 25, 1990) (brown tree snake); 56 Fed. Reg. 56,942, 56,942 (Nov. 7, 1991) (zebra mussel); 67 Fed. Reg. 39,865, 39,865 (June 11, 2002) (brushtail possum); 67 Fed. Reg. 62,193, 62,193 (Oct. 4, 2002) (snakehead fish); 72 Fed. Reg. 37,459, 37,469 (July 10, 2007) (silver and largescale carp); 72 Fed. Reg. 59,019, 59,019, 59,027 (Oct. 18, 2007) (black carp); 75 Fed. Reg. 11,808, 11,808 (Mar. 12, 2010) (proposed 2012 Rule); 76 Fed. Reg. 15,857, 15,857 (Mar. 22, 2011) (bighead carp); 77 Fed. Reg. 3,330, 3,330 (Jan. 23, 2012) (final 2012 Rule); 80 Fed. Reg. 12,702, 12,705–06 (Mar. 10, 2015) (final 2015 Rule).

the demands of changing circumstances." *Brown & Williamson Tobacco Corp.*, 520 U.S. at 156–57 (citations and internal quotation marks omitted). Here, the introduction, establishment, and spread of injurious species in the United States represents a changed circumstance that supports the need for prohibitions on interstate transportation of injurious wildlife.

Addressing the second and third factors, the district court found that "the legislative record is not uniform" as to whether Congress was aware of the Service's interpretation. [Dkt.52 p.29]. The court first recounted that "courts should be 'extremely hesitant to presume general congressional awareness of the [agency's] construction based upon a few isolated statements in the thousands of pages of legislative documents.'" *Id.* (quoting *SEC v. Sloan*, 436 U.S. 103, 121 (1978)). But the court itself did that in concluding that "the legislative record is not uniform"—the only statement the court cited as contrary to the Service's current position was the 1990 statement from Assistant Secretary Harriman concerning the zebra mussel. *Id.* In contrast, the great weight of the "thousands of pages" of analyses and final rules from the Service, dating back to 1982, made the agency's interpretation clear. And there is no need to presume that Congress was aware of that interpretation because the legislative history of the subsequent statutory listings of injurious species demonstrates that Congress believed and intended that § 42(a)(1) would effectively prohibit the interstate transport of injurious species. This case presents an unusually

clear example of congressional ratification of an agency's interpretation, demonstrating Congress's unambiguous intent concerning § 42(a)(1).

>    2.    *Implied Amendment*

The district court believed "the question is close" as to whether Congress impliedly amended § 42(a)(1) to prohibit interstate transport in the 2010 amendment listing the bighead carp.  [Dkt.52 p.34].  Implied amendment occurs when two statutes irreconcilably conflict such that "'there is a positive repugnancy between them' or 'they cannot mutually coexist.'"  *Howard v. Pritzker*, 775 F.3d 430, 437 (D.C. Cir. 2015) (quoting *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976)).  Examining the legislative history of the injurious-wildlife provision from 1900 to the present, Congress's intent to regulate interstate transport of injurious wildlife has been consistent.  The only conflicting interpretation is the district court's conclusion that congressional silence on the issue in 1960 foreclosed the Service's interpretation.

But even if the district court was correct, then this Court could still conclude that the Service acted within its statutory authority by finding that Congress impliedly amended § 42(a)(1).  Congress clearly intended to criminalize the interstate transport of bighead carp,[11] and that purpose conflicts with the district court's reading of the

---

[11] The district court erred in relying on *Tennessee Valley Authority v. Hill*, 437 U.S. 153 (1978).  In that case, the Court held that statements from a congressional committee with no jurisdiction over the proposed project did not show that the entire Congress was aware of the agency's position.  *Id.* at 191–92.  Here, there is every indication that Congress was aware that it was criminalizing interstate transportation of bighead carp.

1960 legislative history. *Cf. Rodriguez v. United States*, 480 U.S. 522, 526 (1987) (declining to find an implied repeal when "neither the language nor the legislative history of [the statute] provide[d] any basis" for such a conclusion). Where there is a conflict between two statutes, the more specific statute applies. *Howard*, 775 F.3d at 438 (holding that Title VII's specific time limits trumped the general limitations period found in 24 U.S.C. § 2401(a)); *see also Brown v. General Servs. Admin.*, 425 U.S. 820, 834 (1961) (holding that Congress's "precisely drawn, detailed statute pre-empts more general remedies"). Additionally, the Supreme Court has repeatedly held that "a specific policy embodied in a later federal statute" should control interpretation of the older statute, "even though it had not been expressly amended." *United States v. Estate of Romani*, 523 U.S. 517, 530–31 (1998). Here, Congress articulated a specific intent and policy goal when listing the bighead carp under § 42(a)(1), and that specific policy should control.

> 3.    *The district court's rationale in rejecting ratification and implied amendment was incorrect.*

In finding that Congress did not ratify or impliedly amend the Lacey Act, the district court repeatedly concluded that Congress's reading of the Lacey Act in a particular circumstance did not mean Congress intended to prohibit interstate transport of *all* injurious species. [Dkt.52 p.32, 34]. But the legislative history shows that Congress did not just intend to criminalize the interstate transport of zebra mussels and bighead carp—Congress believed § 42(a)(1) already prohibited interstate

transportation of *any* injurious species. And a congressional report recently expressed this understanding with respect to the very snakes at issue in this litigation. *See* H. Rep. No. 112-691, at 2 (2012) ("Section 42 currently prohibits the importation or interstate shipment of certain injurious animals. The species added by H.R. 511 include the Indian python, the reticulated python, the Northern African python, the Southern African python, the boa constrictor, the yellow anaconda, the DeSchauensee's anaconda, the green anaconda, and the Beni anaconda.").

Moreover, the district court's rationale would require the same statutory language to prohibit different activities for different injurious species, revealed only by the legislative history of each listing decision. The legislative history of the bighead carp listing could render interstate transport of bighead carp illegal, but not interstate transport of the silver, largescale silver, or black carp species listed by the Service, or even the brown tree snake, which Congress listed without discussing the precise effect of the amendment on interstate transport. The district court's failure to find an implied amendment, therefore, created a new conflict within § 42(a)(1).

Furthermore, the district court's assertion that ratification and implied amendment require Congress to undertake some sort of policy debate on the issue is unreasonable and without precedent. [Dkt.52 p.34–35]. The legislative histories of the zebra-mussel and Asian-carp amendments leave no doubt that Congress was fully aware that it was criminalizing interstate transport of the species by listing them as injurious. The district court viewed the prohibition on interstate transport as an

expansion of the statute's reach that Congress should have discussed.  [Dkt.52 p.34].

But in light of Congress's clear intent to regulate similar activity at the time of the

Lacey Act's enactment, it is more likely that Congress simply believed the scope of the

Act had already been established.  Furthermore, the Senate and House reports and

floor statements show that Congress considered the effects of its amendments and

was able to reach agreement on interstate transportation even without a "policy

debate."  For these reasons, the Court should find that Congress ratified or impliedly

amended § 42(a)(1) to prohibit interstate transportation of injurious wildlife.

## II.   UNDER *CHEVRON* STEP TWO, THE COURT SHOULD DEFER TO THE SERVICE'S REASONABLE INTERPRETATION OF THE INJURIOUS WILDLIFE PROVISION.

The Court need not proceed to *Chevron* step two because, as the preceding

discussion demonstrates, Congress unambiguously intended for 18 U.S.C. § 42(a)(1)

to prohibit the interstate transport of injurious species.  If, however, the Court finds

that the statute is ambiguous, the Court must defer to the agency's interpretation

because that ambiguity "has left the agency with a range of possibilities and that the

agency's interpretation falls *within* that range."  *Vill. of Barrington, Ill. v. Surface Transp.

Bd.*, 636 F.3d 650, 660 (D.C. Cir. 2011).

### A.   The Service's interpretation of 18 U.S.C. § 42 was reasonable and entitled to deference.

Under the second step in *Chevron*, "considerable weight should be accorded to

an executive department's construction of a statutory scheme it is entrusted to

administer." *Chevron*, 467 U.S. at 844. An agency's interpretation is entitled to *Chevron* deference when (1) the agency's interpretation was promulgated in the exercise of authority delegated by Congress; (2) the interpretation is based on a permissible construction of the statute; and (3) if the agency's interpretation represents a change in course, it is supported by a reasoned analysis. *See Alabama Educ. Ass'n v. Chao*, 455 F.3d 386, 393 (D.C. Cir. 2006). The Service's interpretation of § 42(a)(1) meets each of these requirements.

First, "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency *generally* to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001) (emphasis added). This inquiry "does not turn on whether Congress's delegation of authority was general or specific." *Mayo Found. for Medical Educ. & Research v. United States*, 562 U.S. 44, 57 (2011). Here, Congress delegated to the Service the authority to "enforce the provisions of this subsection, including any regulations issued hereunder." 18 U.S.C. § 42(a)(5); *see also* 16 U.S.C. § 701 (authorizing the Secretary of the Interior to "adopt such measures as may be necessary" and "make and publish all needful rules and regulations for carrying out the purposes of [the Lacey] Act"). Inherent in the general ability to enforce a criminal provision is the authority to determine whether an act falls within the conduct Congress has prohibited. It is irrelevant that Congress did

46

not explicitly grant the Service authority to interpret the specific phrase at issue. The Court need not consider "whether *the particular issue* was committed to agency discretion"—the conferral of general regulatory authority is sufficient to qualify for *Chevron* deference. *City of Arlington, Tex. v. F.C.C.*, 133 S. Ct. 1863, 1874 (2013).

Even if § 42(a)(5) does not expressly authorize the agency to interpret the scope of the prohibition, Congress may have implicitly granted such authority. *See Mead Corp.*, 533 at 229 (*Chevron* applies even absent an express delegation from Congress when it is "apparent from the agency's generally conferred authority and other statutory circumstances that Congress would expect that the agency be able to speak with the force of law"). When determining whether a species is injurious, the Service weighs a species' likelihood of release or escape and potential to survive and establish a population within the United States against the ability to prevent such escape and establishment. *See* [Dkt.32-1 p.5–6]. The ability to prohibit the interstate transportation of such species is therefore a determinative factor in whether a species should be considered injurious under § 42.

Second, the Service's interpretation of the injurious-wildlife provision as prohibiting interstate transport is permissible. "The interpretation makes considerable sense in terms of the statute's basic objectives." *Barnhart*, 535 U.S. at 219. The plain language of the statute can be read to support the Service's interpretation, and the Lacey Act's original enactment prohibited interstate transport of illegally imported wildlife. Moreover, the fact that all statements from Congress since 1990 mirror the

47

agency's interpretation supports the reasonableness of the Service's interpretation. *See Babbitt v. Sweet Home Chapter, Communities for Great Ore.,* 515 U.S. 687, 704 (1995) (finding that the court's "conclusion that the Secretary's definition of 'harm' rests on a permissible construction of the [statute] gains further support from the legislative history," where that history makes clear that a criminal prohibition against "take" of species should apply more broadly to cover indirect as well as purposeful actions); *see also Parker v. Califano*, 561 F.2d 320, 339 (D.C. Cir. 1977).

Third, to the extent the Service's interpretation represents a departure from isolated statements offered before Congress or the aborted reorganization of the injurious-wildlife provision in the 1970s, the Service's listings over the last 33 years provide a rationale for the shift. When first articulating its interpretation in the Environmental Assessment for the raccoon dog listing in 1982, the Service notes that the rule, which the Service intended to prohibit interstate transport, was necessary because "[a]dverse [e]ffects from raccoon dog introductions would transcend State lines and become regional or national in occurrence." Raccoon Dog EA at 2. In the subsequent final rules listing injurious species, the Service continued to explain the need for regulating interstate transport.[12] And the 1960 amendment highlighted the

---

[12] *See, e.g.*, 55 Fed. Reg. at 17,441 (explaining the need to restrict the "importation and spread" of the brown tree snake); 67 Fed. Reg. at 62,200 (noting the high likelihood of release or escape of snakeheads and the fact that "there are few waters in the United States" that would preclude snakeheads from becoming established); 72 Fed. Reg. at 37,461 (citing concern about further expansion from riverine environments and into lake environments as a reason to list the silver and largescale silver carp).

deficiency of the other interpretation, explaining that merely banning importation of injurious species would not remedy harm from species that, like the English sparrow, were already established in the continental United States. *See H.R. 10329 and H.R. 10598: Hearing Before the House Comm. on the Judiciary*, 86th Cong. 7 (1960); *cf. Chao*, 455 F.3d at 396–97. Furthermore, concerns that the agency's changed interpretation may be arbitrary and capricious and in violation of the separation-of-powers doctrine do not apply here. *Cf. AKM LLC dba Volks Constructors v. Sec'y of Labor*, 675 F.3d 752, 765 (D.C. Cir. 2012). To the extent the Service altered its interpretation, it simply adopted Congress's original intent to regulate interstate transportation of certain species. And the Service has consistently applied that interpretation in its listings over the last 33 years. *See Barnhart*, 535 U.S. at 220 ("[T]his Court will normally accord particular deference to an agency interpretation of 'longstanding' duration."); *Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319, 332 (D.C. Cir. 2011) (deferring to an agency interpretation dating back 36 years).

Because Congress delegated to the Service general authority to enforce § 42(a)(1) and the Service's longstanding interpretation of that provision mirrors Congress's own intent at the time the statute was enacted, the Court should defer to the Service's reading of the injurious-wildlife provision.

### B.    The rule of lenity does not preclude *Chevron* deference in this case.

The district court raised, but did not decide, the issue of whether *Chevron* deference applies to an agency's interpretation of criminal statutes it is authorized to enforce. [Dkt.52 p.12–13]. The court's question stems from concern that *Chevron* deference competes with the rule of lenity as the appropriate means for resolving statutory ambiguity. The rule of lenity provides that ambiguous criminal statutes be construed in favor of the defendant. *Yates,* 135 S. Ct. at 1088. The rule applies "after all legitimate tools of interpretation have been exhausted" and "a reasonable doubt persists regarding whether Congress has made the defendant's conduct a federal crime." *Id.* Courts have pointed to two main purposes for the rule: fair notice to defendants of what conduct is prohibited; and separation of powers, in that "legislatures and not courts should define criminal activity." *Sweet Home,* 515 U.S. at 704 n.18.

The first of these purposes is served by applying *Chevron*, rather than the rule of lenity, to the interpretive question in this case. In facial challenges such as this one, there is no concern about fair notice because no one is being prosecuted, and because the agency's stated interpretation, provided at the time of listing, *reduces* ambiguity over the scope of the Section 42(a)(1) prohibition.[13] USARK and the rest of the

---

[13] *See, e.g., Legislative Hearing on H.R. 511 Before the Subcomm. on Fisheries, Wildlife, Oceans and Insular Affairs of the H. Comm. on Natural Resources*, 112th Cong. 28–29 (2012),

public had the opportunity to engage in the rulemaking process through public notice and comment.  *See* 73 Fed. Reg. at 5,785; *see also* 80 Fed. Reg. at 12,722–41 (stating, in responses to public comments, that the 2015 Rule prohibits interstate transportation of listed snakes).  Moreover, like the regulation upheld in *Sweet Home*, the Service has interpreted § 42(a)(1) to prohibit interstate transportation for more than 33 years.  Therefore, this case falls within precedent supporting *Chevron* deference when the agency is interpreting a statute that it is charged with administering, even though criminal penalties may attach.  This Court has deferred to executive-agency interpretations of a variety of laws that have both criminal and administrative applications.[14]  And, as the Supreme Court noted in *Sweet Home*, it has "never suggested that the rule of lenity should provide the standard for reviewing facial challenges to administrative regulations whenever the governing statute authorizes criminal enforcement."  515 U.S. at 704 n.18; *see also Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1335–36 (2011) (giving deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), to agencies' consistent views in briefs and manuals concerning the anti-retaliation provision in the Fair Labor Standards Act although

---

http://www.gpo.gov/fdsys/pkg/CHRG-112hhrg77021/pdf/CHRG-112hhrg77021.pdf (statement of Andrew Wyatt, President, USARK) (acknowledging that listing constrictor snakes under § 42(a)(1) would prohibit interstate transportation).

[14]  *See In re Sealed Case*, 223 F.3d 775, 779 (D.C. Cir. 2000); *United States v. Kanchanalak*, 192 F.3d 1037, 1047 & n. 17 (D.C. Cir. 1999).

"those who violate the antiretaliation provision…are subject to criminal sanction"); *United States* v. *O'Hagan*, 521 U.S. 642, 673 (1997) (deferring to regulation adopted by the Securities and Exchange Commission in a criminal case, where the Commission's interpretation was set out in a legislative rule forbidding certain acts).

The second purpose underlying the rule of lenity concerns the separation of powers. In recent cases, some Justices have shown an interest in reinvigorating the rule of lenity for this reason. *See Whitman v. United States*, 135 S. Ct. 352, 353–54 (2014) (Scalia, J., statement respecting denial of certiorari); *see also United States v. Apel*, 134 S. Ct. 1144, 1151 (2014); *United States v. Abramski*, 134 S. Ct. 2259, 2274 (2014). But that is not a problem here because Congress itself has listed injurious wildlife with the stated intent of imposing criminal penalties on individuals who transport such wildlife across state lines. Furthermore, the Supreme Court's current precedent supports the application of *Chevron* deference in this case. *See Kasten*, 131 S. Ct. at 1335–36; *O'Hagan*, 521 U.S. at 673; *Sweet Home*, 515 U.S. at 704 n.18. Therefore, if the Court concludes that Congress has not spoken to the scope of the interstate-transport prohibition in the injurious-wildlife provision, the Court should defer to the Service's reasonable interpretation.

## III.   THE DISTRICT COURT ABUSED ITS DISCRETION WHEN BALANCING USARK'S ALLEGED HARM AGAINST THE PUBLIC'S INTEREST IN PREVENTING CATASTROPHIC ECOLOGICAL HARM FROM GIANT CONSTRICTORS.

The district court abused its discretion in issuing an injunction against implementation of the 2015 Rule because USARK failed to establish that its members would suffer irreparable harm outweighing the catastrophic harm that an established population of reticulated pythons and green anacondas would have on native ecology. "This [C]ourt has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The harm must be "both certain and great," "actual and not theoretical," and "beyond remediation." *Id.* Economic harm does not constitute irreparable harm unless the claimed loss is unrecoverable and will seriously affect the movant. *See Wis. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985).

Here, contrary to the district court's finding ([Dkt.52 p.44]), USARK failed to establish that the 2015 Rule will cause certain, imminent, and unrecoverable economic harm. *See* [Dkt.28-9 p.2] (stating that he recovered business since the Burmese python listing in 2012); [Dkt.28-4 p.2] ("hop[ing] to one day make substantial income back" from his personal reptile collection); [Dkt.28-8 p.1–2] (citing lost revenue, but saying that only "[t]hese *animals* are irreplaceable"); [Dkt.28-10 p.2] (noting that his retail business "has been growing extremely well, even with the looming and increased interference of the [Service]"). USARK's assertions of harm rest on two assumptions

53

that it failed to prove.  First, USARK cannot rely on claims that the reticulated python and green anaconda pet and hobby markets will substantially contract due to the rule because that conclusion rests on independent market forces.  *See Am. Meat Inst. v. U.S. Dep't of Agric.*, 968 F. Supp. 2d 38, 810–81 (D.D.C. 2013) (citing *Wis. Gas Co.*, 758 F.2d at 674).  Second, USARK failed to establish that either they or a significant portion of their customers will be unable to receive permits from the Service exempting them from the 2015 Rule.  *See* [Dkt.28-6 p.1–2] (discussing educational and zoological interests).  Finally, an injunction will not remedy some of USARK's alleged harms.  *See* [Dkt.28-5 p.2] (violating even USARK's interpretation of § 42(a)(1) by driving through Washington, D.C., to reach his vet in Virginia).

In contrast to these speculative economic harms, the public has a compelling interest in preventing the introduction and spread of invasive constrictor species. "[E]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often…irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).  The Service presented evidence that "reticulated pythons have escaped captivity or were spotted in the wild in…California, Florida, Illinois, Kansas, Maine, New Jersey, Ohio, Pennsylvania, Washington, and West Virginia." [Dkt.32-1 p.7].  If these escaped snakes established populations in the wild, "it would be extremely difficult, if not impossible, to eradicate them." [Dkt.32-1 p.13]; *see also* 80 Fed. Reg. at 12,715 (finding no reports of any successful eradication of nonnative reptiles in the United States).  Thus, the introduction of these snakes into the wild threatens to

disturb biodiversity in unique and vulnerable American ecosystems beyond the point of recoverability.  80 Fed. Reg. at 12,714–18.  The magnitude of this irreversible harm outweighs USARK's speculative economic harms such that the district court abused its discretion in enjoining the implementation of the 2015 Rule.

## CONCLUSION

For the foregoing reasons, the district court's decision should be reversed and the preliminary injunction should be vacated.

Respectfully submitted,

JOHN C. CRUDEN
   *Assistant Attorney General*

*Of Counsel:*

RUSSELL HUSEN
   *Office of the Solicitor*
   *U.S. Department of the Interior*
   *Washington, DC*

MEREDITH L. FLAX
EMILY A. POLACHEK
   *Attorneys, Appellate Section*
   *Environment and Natural Res. Div.*
   *U.S. Department of Justice*
   *P.O. Box 7415*
   *Washington, D.C.  20044*
   *(202) 514-5442*
   *emily.polachek@usdoj.gov*

December 2, 2015
90-8-4-07644

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

I hereby certify that this brief complies with the requirements of Fed. R. App.

P. 32(a)(5) and (6) because it has been prepared in 14-point Garamond, a

proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of Fed.

R. App. P. 32(a)(7)(B) because it contains 13,969 words, excluding the parts of the

brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.


  s/ Emily A. Polachek
  EMILY A. POLACHEK

## CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2015, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

s/ Emily A. Polachek
EMILY A. POLACHEK